**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| ABHI SHETH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CLEO COMMUNICATIONS US, LLC, and THE HERTZ CORPORATION,<br><br>Defendants. | Case No. 3:25-cv-50194<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Abhi Sheth ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to himself, and on information and belief as to all other matters, by and through undersigned counsel, brings this Class Action Complaint against Defendants Cleo Communications US, LLC ("Cleo") and The Hertz Corporation ("Hertz") (together, "Defendants").

## SUMMARY OF THE CASE

1. Plaintiff brings this class action against Defendants for their failure to secure and safeguard the sensitive personally identifiable information and protected health information of hundreds of thousands of consumers.

2. Defendant Cleo is a Rockford, Illinois-based company that provides software services to its clients, including Defendant Hertz, a globally recognized car rental company that serves hundreds of thousands of consumers throughout the United States.

3. Defendants collect and maintain the highly sensitive Personal Information from their clients and/or customers for business purposes, and as a condition to providing services.

4. On or about April 11, 2025, Hertz reported a data security incident with the Offices of the Attorney General in Maine and California and, on the same day, began sending out data breach letters to individuals whose information was compromised as a result of the incident (the "Notice").

5. Hertz reported that, on February 10, 2025, it "confirmed that Hertz data was acquired by an unauthorized third party that . . . exploited zero-day vulnerabilities within Cleo's platform in October 2024 and December 2024" (the "Data Breach"). Hertz responded by launching an investigation "to determine the scope of the event and to identify individuals whose personal information may have been impacted."

6. Hertz admitted that the information compromised in the Data Breach included sensitive personal information such as names, dates of birth, contact information, credit card information, driver's license information, information related to worker's compensation claims, Social Security numbers (SSNs) or other government identification numbers, passport information, and personally identifying information, and protected health information ("PII"), and protected health information ("PHI") (collectively, "Personal Information")."[1]

7. Despite learning of the Data Breach as early as February 10, 2025, Hertz did not announce the Data Breach publicly until approximately two months later on or around April 11, 2025 and did not begin sending out Data Breach notification letters to affected individuals until around that time.

8. Hertz provided limited details about the Data Breach, including whether or not the cybercriminal(s) responsible for breach were identified or whether the information exfiltrated was

[1] https://www.hertz.com/content/dam/hertz/global/resources/Notice_of_Data_Incident-United_States.pdf (last accessed April 22, 2025).

held for ransom. Hertz also did not disclose whether its investigation detected the compromised information on the dark web. Instead, Hertz merely stated that it "has confirmed that Cleo took steps to investigate the event and address the identified vulnerabilities."

9. By being entrusted with Plaintiff's and Class Members' Personal Information for their own pecuniary benefit, Defendants assumed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class Members' Personal Information against unauthorized access and disclosure. Defendants also had a duty to adequately safeguard this Personal Information under federal and state laws, as well as pursuant to industry standards and duties imposed by statutes, including Section 5 of the Federal Trade Commission Act ("FTC Act"). Defendants breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the Personal Information in their possession from unauthorized access and disclosure.

10. As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff and Class Members suffered injury and ascertainable losses in the form of out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach, the diminution in value of their Personal Information from their exposure, and the present and imminent threat of fraud and identity theft. This action seeks to remedy these failings and their consequences.

11. Plaintiff, on behalf of himself and all other Class Members, brings claims for negligence, negligence per se, breach of implied contract, unjust enrichment, violations of the Washington consumer protection law, and for declaratory relief.

## PARTIES

12. Plaintiff Abhi Sheth is a citizen of the state of Washington and resides in Seattle, Washington. Plaintiff received a letter from Hertz, dated April 14, 2025, notifying him that his Personal Information was compromised in the Data Breach.

13. Defendant Cleo Communications US, LLC is a limited liability company with its headquarters and principal place of business located in Rockford, Illinois.

14. Defendant The Hertz Corporation is a Delaware corporation with its principal place of business located in Estero, Florida.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants.

16. This Court has personal jurisdiction over Cleo because Cleo's principal place of business is located in this District.

17. This Court has personal jurisdiction over Hertz because a substantial part of the events and omissions giving rise to this action occurred in this District, and Hertz intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Cleo's principal place of business is located in this District, and a substantial part of the events or omissions giving rise to this action occurred in this District.

## STATEMENT OF FACTS

### A. Overview of Defendants' Businesses

19. Cleo is a Rockford, Illinois-based company that provides software services to business, including Hertz.

20. Hertz is one of the world's largest car rental companies, with locations in more than 160 countries. Hertz employs more than 25,000 people and generates approximately $9 billion in annual revenue.[2]

21. Defendants collect and maintain the highly sensitive Personal Information from their clients and/or consumers for business purposes, and as a condition to providing services.

22. Hertz' Privacy Policy, available on its website, states: "We reasonable means to safeguard Personal Information under our control. We use reasonable administrative, technical, personnel, and physical measures that are designed to safeguard and ensure the integrity of Personal Information."

23. By obtaining, collecting, using, and benefitting from Plaintiff's and Class member's Personal Information, Defendants assumed legal and equitable duties to them that required Defendants to, at a minimum, implement adequate safeguards to prevent unauthorized use or disclosure of Personal Information and to report any unauthorized use or disclosure of Personal Information.

24. Plaintiff and Class Members transacted with Defendants and entrusted Defendants with their Personal Information.

---

[2] https://s204.q4cdn.com/384814028/files/doc_financials/2024/q4/Hertz-Global-2024-10-K.pdf

25. Plaintiff and Class Members reasonably relied on Defendants to maintain the confidentiality and security of their Personal Information and only to make required, authorized disclosures of this information, which Defendants ultimately failed to do. Compounding Defendants' breach of these duties, Defendants waited approximately two months after discovering the Data Breach to notify those affected that their Personal Information had been compromised.

**B. The Data Breach Compromised Plaintiff's and Class Members' Personal Information**

26. On or about February 10, 2025, Hertz "confirmed that Hertz data was acquired by an unauthorized third party that . . . exploited zero-day vulnerabilities within Cleo's platform in October 2024 and December 2024." Hertz responded by launching an investigation "to determine the scope of the event and to identify individuals whose personal information may have been impacted."

27. Hertz did not publicly announce the Data Breach until on or around April 11, 2025. According to the Notice Hertz filed with the Offices of the Maine and California Attorney General and *Notice of Security Incident* published on Hertz's website, the information compromised in the Data Breach included sensitive personal information such as names, dates of birth, contact information, credit card information, driver's license information, information related to worker's compensation claims, Social Security numbers (SSNs) or other government identification numbers, passport information, and personally identifying information, and protected health information."[3]

---

[3] https://www.hertz.com/content/dam/hertz/global/resources/Notice_of_Data_Incident-United_States.pdf (last accessed April 22, 2025).

28. Despite learning of the Data Breach as early as February 10, 2025, Hertz did not announce the Data Breach publicly until approximately two months later on or around April 11, 2025 and did not begin sending out Data Breach notification letters to affected individuals until around that time.

29. Hertz' Notice omits pertinent information including whether or not the cybercriminal(s) responsible for breach were identified or whether the information exfiltrated was held for ransom, whether its investigation detected the compromised information on the dark web, the reason for the delay in notifying Plaintiff and Class Members of the Data Breach, how it determined that the Personal Information had been accessed, and of particular importance to Plaintiff and Class Members, what *actual* steps Cleo took following the Data Breach to secure its systems and train its employees to prevent further cyberattacks.

30. To date, Defendants have provided limited details about the Data Breach. Hertz' Notice merely stated that it "has confirmed that Cleo took steps to investigate the event and address the identified vulnerabilities."

31. As businesses that regularly collect, create, and maintain significant volumes of Personal Information, the targeted attack was a foreseeable risk of which Defendants were aware and knew they had a duty to guard against.

32. The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Personal Information collected from Defendants' clients, customers, and other individuals who are affiliated or transacted with Defendants.

33. Due to Defendants' inadequate security measures and their delayed notice to victims, Plaintiff and Class Members now face a present, immediate, and ongoing risk of fraud and identity theft and must deal with that threat forever.

34. Defendants had obligations created by contract, industry standards, Section 5 of FTC Act, common law, and state consumer protection laws made to Plaintiff and Class Members to keep their Personal Information confidential and to protect it from unauthorized access and disclosure.

35. Plaintiff and Class Members entrusted their Personal Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with obligations to keep such information confidential and secure from unauthorized access after receiving such information.

36. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Personal Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Personal Information from unauthorized disclosure.

37. As a result of Defendants' negligent and wrongful conduct, Plaintiff's and Class Members' highly confidential and sensitive Personal Information was left exposed to cybercriminals.

**C. Defendants Failed to Follow FTC Guidelines**

38. Defendants were also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information

is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp*., 799 F.3d 236 (3d Cir. 2015).

39. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

40. According to the FTC, the need for data security should be factored into all business decision-making.

41. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.

42. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

43. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

44. The FTC further recommends that companies not maintain Personal Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

45. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

46. Defendants failed to properly implement basic data security practices.

47. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' Personal Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

48. Defendants were at all times fully aware of their obligation to protect the Personal Information of the individuals who entrusted Defendants with that information. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**D. Defendants Failed to Comply with Industry Standards for Data Security**

49. Experts studying cyber security routinely identify corporations as being particularly vulnerable to cyberattacks because of the value of the Personal Information which they collect and maintain.

50. Several best practices have been identified that at a minimum should be implemented by corporate entities like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

51. Other standard best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers;

monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

52. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

53. These foregoing frameworks are existing and applicable industry standards in the corporate industry and Defendants failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

### E. Defendants Owed Plaintiff and Class Members a Duty to Safeguard Their Personal Information

54. In addition, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the Personal Information of Class Members.

55. Defendants owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Personal Information in their possession.

56. Defendants owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Personal Information in a timely manner.

57. Defendants owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

58. Defendants owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

59. Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

**F. Defendants Knew That Criminals Target Personal Information**

60. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of Personal Information preceding the date of the breach.

61. At all relevant times, Defendants knew, or should have known, that Plaintiff's, and all other Class Members' Personal Information was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Personal Information from cyber-attacks that Defendants should have anticipated and guarded against.

62. The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Personal Information of Defendants' clients and customers, like Plaintiff and Class Members.

63. Personal Information is a valuable property right.[4] The value of Personal Information as a commodity is measurable.[5] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[6] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[7] It is so valuable to identity thieves that once Personal Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

64. As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, Personal Information, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

---

[4] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP Advances in Information and Communication Technology (May 2015), https://www.researchgate.net/publication/283668023 ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible...").

[5] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, Medscape (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[6] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220, p.4, OECD Publishing (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[7] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, Interactive Advertising Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

65. Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[8] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[9] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[10] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[11] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[12]

66. Criminals can use stolen Personal Information to extort a financial payment by "leveraging details specific to a disease or terminal illness."[13] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a

---

[8] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[9] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[10] Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC Magazine (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[11] *In the Dark*, VPNOverview.com, accessible at https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed on Nov. 14, 2022).

[12] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI Cyber Division (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[13] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[14]

67. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[15]

68. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Personal Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

69. Indeed, cyberattacks have been common for over ten years with the Federal Bureau of Investigation ("FBI") warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[16]

70. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to

---

[14] *Id.*

[15] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Information Systems Research 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

[16] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[17]

71. Defendants were on notice that the federal government has been concerned about company data encryption practices.

72. The Office for Civil Rights ("OCR") urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, OCR's deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[18]

73. Theft of Personal Information is serious. The FTC warns consumers that identity thieves use Personal Information to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[19]

74. Identity thieves use Personal Information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[20] According to Experian, one of the

---

[17] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[18] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. Department of Health and Human Services (Apr. 22, 2014), https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

[19] *See What to Know About Identity Theft*, Federal Trade Commission Consumer Advice, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed on Nov. 15, 2022).

[20] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame,

largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.[21]

75. With access to an individual's Personal Information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture, using the victim's name and SSN to obtain government benefits, or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[22]

76. Each year, identity theft causes billions of dollars of losses to victims in the United States. For example, with the Personal Information stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud,

---

social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[21] Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, Experian (Sept. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[22] *See Warning Signs of Identity Theft*, Federal Trade Commission, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited Nov. 15, 2022).

apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

77. Personal Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on dark web black-markets for years.

78. For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

79. The Personal Information exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein. These risks are both certainly impending and substantial. As the FTC has reported, if cyber thieves get access to a person's highly sensitive information, they will use it.[23]

80. Cyber criminals may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for

---

[23] Ari Lazarus, *How fast will identity thieves use stolen info?*, Federal Trade Commission (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

> years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[24]

81. For instance, with a stolen Social Security number, which is only one subset of the Personal Information compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.25

82. Identity thieves can use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

83. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

---

[24] *Report to Congressional Requesters: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, United States Government Accountability Office, https://www.gao.gov/assets/gao-07-737.pdf.

[25] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number* (Nov. 2, 2017), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

84. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[26]

85. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the victim has suffered the harm.

86. Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[27]

87. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the

---

[26] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, Identity Theft Resource Center (2021), accessible at https://www.idtheftcenter.org/identity-theft-aftermath-study/.

[27] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

88. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[28]

89. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their Personal Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

90. A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:




[28] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

91. Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[29]

92. As a direct and proximate result of the Data Breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class Members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and other account information for unauthorized activity for years to come.

93. Plaintiff and Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

a. Trespass, damage to, and theft of their personal property, including Personal Information;

b. Improper disclosure of their Personal Information;

c. The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Personal Information being in the hands of criminals and having already been misused;

---

[29] *Guide for Assisting Identity Theft Victims*, Federal Trade Commission, 4 (Sept. 2013), http://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

d. Damages flowing from the untimely and inadequate notification of the Data Breach;

e. Loss of privacy suffered as a result of the Data Breach;

f. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the data breach;

g. Ascertainable losses in the form of deprivation of the value of patients' personal information for which there is a well-established and quantifiable national and international market;

h. The loss of use of and access to their credit, accounts, and/or funds;

i. Damage to their credit due to fraudulent use of their Personal Information; and

j. Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

94. Moreover, Plaintiff and Class Members have an interest in ensuring that their Personal Information, which remains in the possession of Defendants, is protected from further public disclosure by the implementation of compliant security measures and safeguards.

**G. The Data Breach Was Foreseeable and Preventable**

95. Data disclosures and data breaches are preventable.[30] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[31] She added that "[o]rganizations that collect, use, store, and share

---

[30] Lucy L. Thompson, *Despite the Alarming Trends, Data Breaches Are Preventable*, Data Breach and Encryption Handbook (Lucy Thompson, ed., 2012).
[31] *Id.* at 17.

sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[32]

96. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[33]

97. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[34]

98. Plaintiff and Class Members entrusted their Personal Information to Defendants with the understanding that Defendants or anyone in Defendants' position would safeguard their Personal Information against cyberattacks, delete or destroy Personal Information that Defendants were no longer required to maintain, and timely and accurately notify them if their Personal Information was compromised.

**H. Plaintiff's and Class Members' Damages**

99. To date, Defendants have done nothing to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach. Hertz only offered two years of identity monitoring services from Kroll, but did not disclose how it determined eligibility. Not only did Defendants fail to provide adequate ongoing credit monitoring or identity protection services for individuals impacted by the Data Breach, but the identity monitoring

---

[32] *Id.* at 28.
[33] *Id.*
[34] *See How to Protect Your Networks from RANSOMWARE*, at 3, FBI.gov, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed Nov. 14, 2022).

services does nothing to compensate Class Members for damages incurred and time spent dealing with the Data Breach.

100. Plaintiff and Class Members have been damaged by the compromise of their Personal Information in the Data Breach.

101. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

102. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Personal Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiff and Class Members.

103. Plaintiff and Class Members have and will also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

104. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and

f. Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

105. Plaintiff and Class Members suffered actual injury from having their Personal Information compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of their Personal Information, a form of property that Defendants obtained from Plaintiff and Class Members; (b) violation of their privacy rights; (c) imminent and impending injury arising from the increased risk of identity theft and fraud; and (d) emotional distress.

106. Further, as a result of Defendants' conduct, Plaintiff and Class Members are forced to live with the anxiety that their Personal Information may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy with respect to that information.

107. As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and are at a present and imminent and increased risk of future harm.

108. Moreover, Plaintiff and Class Members have an interest in ensuring that their Personal Information, which is believed to remain in the possession of Defendants, is protected

from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Personal Information is not accessible online, is properly encrypted, and that access to such data is password protected.

109. Many failures laid the groundwork for the occurrence of the Data Breach, starting with Defendants' failure to incur the costs necessary to implement adequate and reasonable cyber security training, procedures and protocols that were necessary to protect Plaintiff's and Class Members' Personal Information.

110. Defendants maintained the Personal Information in an objectively reckless manner, making the Personal Information vulnerable to unauthorized disclosure.

111. Defendants knew, or reasonably should have known, of the importance of safeguarding Personal Information and of the foreseeable consequences that would result if Plaintiff's and Class Members' Personal Information was stolen, including the significant costs that would be placed on Plaintiff and Class Members as a result of the breach.

112. The risk of improper disclosure of Plaintiff's and Class Members' Personal Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure Plaintiff's and Class Members' Personal Information from that risk left the Personal Information in a dangerous condition.

113. Defendants disregarded the rights of Plaintiff and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that the Personal Information was protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiff's and Class Members' Personal Information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence

and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

## CLASS ALLEGATIONS

114. Plaintiff brings this class action on behalf of himself and all members of the following Classes of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiff seeks certification of a Class defined as follows:

> **Nationwide Class**
> All persons residing in the United States whose Personal Information was compromised in the Data Breach disclosed by Defendants on or about April 11, 2025, including all who were sent notice of the Data Breach.

115. In the alternative, Plaintiff seeks certification of the following class:

> **Washington Class**
>
> All persons residing in the state of Washington whose Personal Information was compromised in the Data Breach disclosed by Defendants on or about April 11, 2025, including all who were sent notice of the Data Breach.

116. Excluded from the class are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

117. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

118. Numerosity: Plaintiff does not know the exact number of Class Members but believes the Class comprises hundreds of thousands of individuals throughout the United States. As such, Class Members are so numerous that joinder of all Class Members is impracticable.

119. Commonality and Predominance: Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' Personal Information from unauthorized access and disclosure;

b. Whether Defendants' computer systems and data security practices used to protect Plaintiff's and Class Members' Personal Information violated the FTC Act and/or state laws and/or Defendants' other duties discussed herein;

c. Whether Defendants failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

d. Whether Plaintiff and Class Members suffered injury as a proximate result of Defendants' negligent actions or failures to act;

e. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' Personal Information;

f. Whether an implied contract existed between Class Members and Defendants providing that Defendants would implement and maintain reasonable security measures to protect and secure Class Members' Personal Information from unauthorized access and disclosure;

g. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiff and Class Members;

h. Whether Defendants breached their duties to protect Plaintiff's and Class Members' Personal Information; and

i. Whether Plaintiff and all other members of the class are entitled to damages and the measure of such damages and relief.

120. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of himself and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

121. Typicality: Plaintiff's claims are typical of the claims of the class. Plaintiff, like all proposed members of the class, had his Personal Information compromised in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

122. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representative of the class and has no interests adverse to, or conflict with, the class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

123. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress from Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
## NEGLIGENCE
## (On Behalf of Plaintiff and the Class, as Against Cleo)

124. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

125. Cleo owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their Personal Information in its possession, custody, or control.

126. Cleo knew, or should have known, the risks of collecting and storing Plaintiff's and all other Class Members' Personal Information and the importance of maintaining secure systems and using encryption. Cleo knew, or should have known, of the many data breaches that targeted corporate entities in recent years.

127. Given the nature of Cleo's business, the sensitivity and value of the Personal Information it maintains, and the resources at its disposal, it should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

128. Cleo breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Personal Information entrusted to it—including Plaintiff's and Class Members' Personal Information.

129. It was reasonably foreseeable to Cleo that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' Personal Information to unauthorized individuals.

130. But for Cleo's negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their Personal Information would not have been compromised.

131. As a result of Cleo's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Personal Information; (iii) breach of the confidentiality of their Personal Information; (iv) deprivation of the value of their Personal Information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the

increased risks of medical identity theft they face and will continue to face; and (vii) actual or attempted fraud.

**COUNT II**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class, as Against Hertz)**

132. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

133. Hertz owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting Personal Information in its possession, custody, or control, and selecting vendors that would exercise reasonable care in safeguarding and protecting Personal Information.

134. Hertz knew, or should have known, the risks of collecting and storing Plaintiff's and all other Class Members' Personal Information and the importance of maintaining secure systems, or hiring vendors and third parties to do the same. Hertz knew, or should have known, of the many data breaches that targeted corporate entities in recent years.

135. Hertz breached these duties by failing to exercise reasonable care in selecting a vendor that would safeguard and protect Plaintiff's and Class Members' Personal Information.

136. It was reasonably foreseeable to Hertz that its failure to exercise reasonable care and putting sensitive Personal Information in the hands of a vendor that does not take data security seriously and employ steps to secure Personal Information would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' Personal Information to unauthorized individuals.

137. But for Hertz's negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their Personal Information would not have been compromised.

138. As a result of Hertz's above-described wrongful actions, inaction, and want of ordinary care, Plaintiff and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Personal Information; (iii) breach of the confidentiality of their Personal Information; (iv) deprivation of the value of their Personal Information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) actual or attempted fraud.

**COUNT III**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class, as Against Cleo)**

139. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

140. Cleo's duties arise from, *inter alia*, from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Cleo, of failing to employ reasonable measures to protect and secure Personal Information.

141. Plaintiff and Class Members are within the class of persons that Section 5 of the FTCA was intended to protect.

142. The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTCA intended to guard against.

143. It was reasonably foreseeable to Cleo that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' Personal Information to unauthorized individuals.

144. The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Cleo's violations of Section 5 of the FTCA. Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Personal Information; (iii) breach of the confidentiality of their Personal Information; (iv) deprivation of the value of their Personal Information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vi) actual or attempted fraud.

**COUNT IV**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class, as Against Hertz)**

145. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

146. Hertz's duties arise from, *inter alia*, from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as

interpreted by the FTC, the unfair act or practice by businesses, such as Hertz, of failing to employ reasonable measures to protect and secure Personal Information.

147. Plaintiff and Class Members are within the class of persons that Section 5 of the FTCA was intended to protect.

148. The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTCA intended to guard against.

149. It was reasonably foreseeable to Hertz that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Personal Information and selecting a vendor for human resources needs that fails to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' Personal Information to unauthorized individuals.

150. The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Hertz's violations of Section 5 of the FTCA. Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Personal Information; (iii) breach of the confidentiality of their Personal Information; (iv) deprivation of the value of their Personal Information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vi) actual or attempted fraud.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class, as Against Hertz)**

151. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

152. Hertz required Plaintiff and Class Members to provide, or authorize the transfer of, their Personal Information in the course of providing services and otherwise transacting business. In exchange, Hertz entered into implied contracts with Plaintiff and Class Members in which Hertz agreed to comply with their statutory and common law duties to protect Plaintiff's and Class Members' Personal Information —including in connection with securing and utilizing the services of third-party vendors to whom Hertz provides the Personal Information —and to timely notify them in the event of a data breach.

153. Plaintiff and Class Members would not have provided their Personal Information to Hertz had they known that Hertz would not safeguard their Personal Information as promised, utilize vendors like Cleo that do not adequately protect Personal Information, or provide timely notice of a data breach.

154. Plaintiff and Class Members fully performed their obligations under their implied contracts with Hertz.

155. Hertz breached the implied contracts by failing to safeguard Plaintiff's and Class Members' Personal Information and by failing to provide them with timely and accurate notice of the Data Breach.

156. The losses and damages Plaintiff and Class Members sustained (as described above) were the direct and proximate result of Hertz's breach of its implied contracts with Plaintiff and Class Members.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class, as Against Cleo)**

157. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

158. This claim is pleaded in the alternative to the implied contract claim.

159. Plaintiff and Class Members conferred a monetary benefit upon Cleo directly or indirectly in the form of monies paid. Specifically, Cleo provides a file transform platform to clients including Hertz, and in so doing received Personal Information from its clients' customers, like Plaintiff and Class Members. In exchange, Plaintiff and Class Members should have received from Cleo the services that were the subject of the transaction and should have had their Personal Information protected with adequate data security.

160. Cleo accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Cleo benefitted from the receipt of Plaintiff's and Class Members' Personal Information. Cleo knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the Personal Information entrusted to it. Cleo profited from Plaintiff's collected and retained data and used Plaintiff's and Class Members' Personal Information for business purposes.

161. As a result of Cleo's conduct, Plaintiff and Class Members suffered actual damages.

162. Cleo should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT VII**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class, as Against Hertz)**

163. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

164. This claim is pleaded in the alternative to the implied contract claim.

165. Plaintiff and Class Members conferred a benefit upon Hertz directly or indirectly. Specifically, Cleo provided a file transfer platform to Hertz, which in turn provided Cleo with Hertz' customers'—i.e., Plaintiff's and Class Members'—Personal Information. As part of this process, Plaintiff and Class Members provided Hertz with their Personal Information, from which Hertz benefited in operating its business. In exchange, Plaintiff and Class Members should have received services obtained by Hertz from Cleo that were the subject of the transaction and should have had their Personal Information protected with adequate data security.

166. Hertz accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Hertz also benefitted from the receipt of Plaintiff's and Class Members' Personal Information as it facilitated its business operations. Hertz knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the Personal Information entrusted to it. Hertz profited from Plaintiff's retained data and used Plaintiff's and Class Members' Personal Information for business purposes.

167. As a result of Hertz's conduct, Plaintiff and Class Members suffered actual damages.

168. Hertz should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT VIII**
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT, RCW § 19.86.010 *et seq.***
**(On Behalf of Plaintiff and the Washington Class, as Against Hertz)**

169. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

170. This claim is brought on behalf of Plaintiff and the Washington Class.

171. Hertz is a "person" within the meaning of the Washington Consumer Protection Act, RCW § 19.86.010(1), and conducts "trade" and "commerce" within the meaning RCW § 19.86.010(2).

172. Plaintiff and Washington Class Members are "persons" within the meaning of RCW § 19.86.010(1).

173. Hertz's failure to adequately safeguard Plaintiff's and Washington Class Members' Personal Information, and to promptly and fully notify Plaintiff and Washington Class Members regarding the Data Breach, is injurious to the public interest pursuant to RCW § 19.86.093(3)(a) because Hertz's actions not only harmed Plaintiff, but harmed hundreds of thousands of other persons.

174. Hertz's failure to safeguard the Personal Information disclosed in the Data Breach, and its failure to provide timely and complete notice of that Data Breach to the victims, causes substantial injury to Plaintiff and Washington Class Members, is not outweighed by any countervailing benefits to consumers or competitors, and is not reasonably avoidable by consumers.

175. Had Plaintiff and Washington Class Members been aware of the omitted and misrepresented facts, *i.e.*, that Hertz would not adequately protect their Personal Information

or hire a third-party vendor to do the same, Plaintiff and Washington Class Members would not have sought services from Hertz.

176. Pursuant to RCW § 19.86.090, Plaintiff seeks actual and treble damages on behalf of himself and all other Washington Class Members.

**COUNT IX**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

177. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

178. Defendants owe duties of care to Plaintiff and Class Members, which require them to adequately secure Plaintiff's and Class Members' Personal Information.

179. Defendants still possess the Personal Information of Plaintiff and the Class Members.

180. Defendants have not satisfied their obligations and legal duties to Plaintiff and Class Members.

181. Actual harm has arisen in the wake of the Data Breach regarding Defendants' obligations and duties of care to provide adequate data security. Further, Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their Personal Information and Defendants' failures to address the security failings that led to such exposure.

182. There is no reason to believe that Defendants' security measures are any more adequate now than they were before the Data Breach to meet their contractual obligations and legal duties.

183. Plaintiff seeks a declaration that: (1) Defendants' existing security measures do not comply with their implicit contractual obligations and duties of care to provide reasonable security

procedures and practices appropriate to the nature of the information to protect Personal Information; and (2) to comply with their implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

e. Conducting regular database scanning and security checks;

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g. Purchasing lifetime credit monitoring and identity theft protection services for Plaintiff and Class Members; and

h. Meaningfully educating Plaintiff and Class Members about the threats they face as a result of the loss of their Personal Information to third parties, as well as the steps they must take to protect themselves.

**PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all other members of the class, respectfully request that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A. Certifying the class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard Personal Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D. Awarding Plaintiff and the class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: April 25, 2025

Respectfully Submitted,

By: /s/_*Gary M. Klinger*_____________
Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

Tina Wolfson*
Bradley K. King*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
twolfson@ahdootwolfson.com
bking@ahdootwolfson.com

**pro hac vice* forthcoming

*Counsel for Plaintiff and the Proposed Class*